TOMPKINS *v*. LITTLE ROCK & FT. S. RY. and others. [1]

WILLIAMS *v*. LITTLE ROCK, M. R. & T. RY. and others.

*(Circuit Court, E. D. Arkansas. 1883.)*

1. STATE BONDS ISSUED IN THE AID OF RAILROADS—ACTION BY BONA FIDE PURCHASERS—LIABILITY OF RAILROAD COMPANIES—STATUTORY LIEN.

In pursuance of an act of the general assembly of the state of Arkansas, approved July 21, 1868, entitled "An act to aid in the construction of railroads," the state of Arkansas issued certain bonds to the defendant railroad companies, the bonds were signed by the governor and countersigned by the treasurer of the state, and duly delivered to the companies and by them sold for value. On the failure of the state to pay the semi-annual interest, this action was brought against the railroad companies to enforce the payment of the same and interest. *Held*, following *Railroad Cos.* v. *Schutte*, 103 U. S. 118, and *Chamberlain* v. *St. Paul, etc., R. Co.* 92 U. S. 299, (1) that there was nothing in the bonds themselves, without indorsement, to bind the companies that received and sold them, to pay either the principal or interest; (2) that conceding the bonds to be invalid on account of the unconstitutionality of the statute under which they were issued, as claimed by the defendants, the holders of them were nevertheless entitled to such remedy as the statute gave against the railroad companies who had accepted and sold the bonds, and had thereby ratified the remedies provided by the statute; (3) that there was nothing contained in said act which would constitute a statutory lien for the benefit of the plaintiffs, into whose hands the bonds had come, as against the property of the railroad companies.

2. SAME—TAXES NOT LIENS.

It is well settled that a tax is not a lien unless it is expressly made so by the law or ordinance which imposes it.

*Heine* v. *Levee Com'rs*, 19 Wall. 659.

In Equity.

*John McClure* and *John R. Dos Passos*, for plaintiffs.

*John F. Dillon* and *C. W. Huntington*, for defendants.

MILLER, Justice. These are two separate suits brought by the holders of bonds issued to the defendant railroad companies, or to their predecessors which had received the bonds, by the state of Arkansas. The bonds are without the indorsement of the companies, and if they are responsible for their payment, as the plaintiffs assert in their bills, that responsibility must arise out of some other matter connected with their acceptance and sale of them to the present holders or their privies. The bonds were in the following form:

*"United States of America.*

"It is hereby certified that the *State of Arkansas* is indebted unto the Little Rock and Fort Smith Railroad Company, or bearer, in the sum of $1,000, lawful money of the United States of America, redeemable in the city of New York thirty years from the date hereof, with interest at the rate of seven per cent. per annum, payable semi-annually, in the city of New York, on the first days of April and October in each year, on the presentation of the proper coupons hereto annexed. The faith and credit of the state are hereby solemnly and irrevocably pledged for the payment of the interest and the redemption of the principal of this bond, issued in pursuance of the act of the general assembly of the state of Arkansas, approved July 21, 1868, entitled

[1] Affirmed. See 8 Sup. Ct. Rep. 762. See, also, 7 Sup. Ct. Rep. 469.

'An act to aid in the construction of railroads;' the said act having been submitted to, and duly ratified by, the people of the state, at the general election held November 3, 1868."

These bonds were signed by the governor and countersigned by the treasurer of the state, duly delivered to the companies, and by them sold for value, and it may be assumed, for the purpose of this opinion, that the plaintiffs are owners or represent holders who are *bona fide* purchasers of them.

The state having failed for several years to pay the semi-annual interest, it was demanded of the railroad companies, who are defendants in these suits, who also refused to pay.

It is clear enough that there is in the bonds themselves, with no indorsement, nothing which binds the companies that received and sold them to pay either the principal or interest. If they were so bound, an action at law would be the proper remedy to enforce the obligation.

The bills, or rather the bill, (I shall in future speak in the singular, as the cases are indentical,) is founded on the ground of an equity arising out of the provisions of the statute referred to in the recital of the bonds as the authority for their issue, and especially an equitable lien on the road or its income, which was built mainly out of the proceeds of the sale of these bonds. Before we proceed to examine into the existence of this lien—that is, whether the statute by its language confers such a lien—we are met by the preliminary proposition on the part of the defendants that the statute itself is void, because it is not in conformity with the provisions of the constitution of the state under which it purports to have been enacted.

The provisions relied on in support of this proposition are section 6, article 10, and section 22 of article 5, of the constitution of 1868. The first of these declares that "the credit of the state or counties shall never be loaned for any purpose without the consent of the people expressed through the ballot-box." The second, that "no public act shall take effect or be in force until ninety days from the expiration of the session at which the same was passed, unless it is otherwise provided in the act."

The statute under which these bonds were issued contained a declaration that it should be submitted to a vote of the people of the state, and provisions for the time when the vote should be taken, the manner of voting, and the means by which the result should be ascertained and declared. It also provides that if it appears that a majority have voted for the act, it shall immediately become operative and have full force. The twelfth section of the act, which relates to this part of the subject is as follows:

Sec. 12. "Be it further enacted, that at the next general election to be holden under the provisions of section 3 of article 15 of the constitution of this state, the proper officers having charge of such election shall, upon a poll, as in other cases, take and receive the ballots of the electors qualified to vote for officers at such election for and against this act, in compliance with section

6 of article 10 of the constitution—such ballot to contain the words 'For Railroads,' or 'Against Railroads,' and if it appears that a majority so voting have voted 'For Railroads,' *this act shall immediately become operative and have full force, and all laws heretofore passed for loaning the credit of this state in aid of railroads, shall cease and be void;* but if a majority shall be found to have voted 'Against Railroads,' this act shall be void and of no effect."

The vote was taken in conformity with this section, was found to be in favor of the issue of the bonds, and was so declared. But the argument against the validity of this proceeding is that the legislature had not adjourned when the popular vote was taken, and therefore the 90 days from the expiration of the session, required by the constitution, had not elapsed when the voting was done, nor did the act declare any other time when the law should go into effect. There was, therefore, no valid law which authorized the vote of the people on the subject. In my opinion, this view of the matter, though sustained by the opinion of the supreme court of the state in the case of *State* v. *Little Rock, M. R. & T. R. Co.* 31 Ark. 701, is erroneous. That opinion, and the argument now made in support of it, are based upon the idea that a separate statute, with all the incidents required to make it a perfect law in itself, was necessary to enable the people to vote whether this proposition should become a law or not. To me it appears plain the *bill* is not a law until approved by the vote of a majority of the people, as the constitution required. Until then it is but a *project* for a law,—a bill which becomes a law when so approved. The constitution means this or it is without meaning. The legislature which framed this bill so understood it and acted on that view. The section copied above declares that if the vote is for the law, it shall then immediately be a law and go into operation; if against it, the act shall be void and of no effect. The statute, then, in describing the means by which the vote shall be ascertained, declares when it shall go into operation; fixes a time different from the 90 days from the expiration of the session, namely, the time when the vote is counted and the result is ascertained. This voting by the people is a *necessary* part of the proceeding, by which this class of statutes is enacted, and they are not laws until this is done. The statute under consideration, when it thus became a law, did contain a specific designation, as required by the constitution, of a time when it should go into effect, and is not void for want of such direction. It was not a law, nor did it on its face purport to be a law, until the approval by the people was officially ascertained. When this was done, it contained a definite provision for the time when it should go into effect. I can see no want of conformity to the constitution in this respect, and this opinion is confirmed by the contemporaneous action of the governor, the commissioners appointed to determine the roads which should receive the bonds and the amount to be awarded each road, and by all the state officers who were called upon to act under the law.

It is argued, however, with much force, that the decision of this question by the supreme court of Arkansas, in the case referred to, is binding on this court, and must be accepted by the latter as the true construction of the constitution of the state, as applied to a statute of the state. Whatever may be my own personal opinion on this question, I do not think it absolutely necessary that it should be decided now; for I am bound by a decision of a similar question by the supreme court of the United States, which renders the point here taken immaterial.

The state of Florida having issued her bonds to railroad companies of the state under a statute which the supreme court of the state decided to be void for want of constitutional authority, the holders of the bonds sued the companies who had received and negotiated them, in the circuit court of the United States, as the plaintiffs in the present suit have done, to enforce the lien which that statute gave to the state as security for the payment of its own bonds. *Railroad Cos.* v. *Schutte*, 103 U. S. 118.

The supreme court of the United States held that, conceding the bonds to be void as against the state, the holders of them were nevertheless entitled to such lien as the statute gave against the railroad companies who had accepted and sold the bonds, and had ratified the lien provided by the statute. Id. 129.

Accepting the doctrine of that case as applicable to this, the remaining question is whether any lien which a court of equity can enforce against these railroad companies or their property or income can be implied from the act of 1868, or arises out of the circumstances of the case. This act by its first section authorized the issue to each railroad company of the state, which should become entitled thereto, of the bonds of the state to the amount of $15,000 per mile where there had been no land grant from the United States, and $10,000 per mile where such grant had been received. By other sections the board of railroad commissioners, a body then in existence, was authorized to ascertain and report to the governor what companies were entitled to receive those bonds, and how many of such bonds of $1,000 each should be issued to the companies applying for them according to rules prescribed by the statute. The obligations which the statute imposes on these companies are found in the sixth, seventh, and eighth sections of it. The first of these declares "that the bonds or the avails of them shall be disposed of solely for the purpose of providing for the ironing, equipping, building, and completing said roads."

As the plaintiffs' claim rests mainly here on the provisions in the seventh and eighth sections of the act, they are here copied in full:

"Sec. 7. Be it further enacted, that the legislature shall from time to time impose upon each railroad company, to which bonds shall have been issued, a tax equal to the amount of the annual interest upon such bonds then outstanding and unpaid, which tax may be paid in money or in the past-due coupons of the state at par, and after expiration of five years from the completion of said road, the legislature shall impose an additional special tax of

two and one-half per cent. per annum, upon the whole amount of state aid granted to such company, payable in money or in bonds and coupons of the state at par; and, if in money, the same shall be invested by the treasurer of the state in the bonds of the state, at their current market value. The taxation in this section provided to continue until the amount of bonds issued to such company, with interest thereon, shall have been paid by said company as herein specified, in which case the said road shall be entitled to a discharge from all claims or liens on the part of the state: provided, that nothing herein contained shall be so construed as to deprive any company, securing a loan of the bonds of the state herein provided for, from paying the whole amount due from such company to the state at any time in the bonds of the state loaned in aid of railroads, or the coupons thereon, or in money."

"Sec. 8. Be it further enacted, that in the case said company shall fail to pay the taxes imposed by the preceding section, at the time the same become due, and for sixty days thereafter, it shall be the duty of the treasurer of the state, by writ of sequestration, to seize and take possession of the income and revenues of said company, until the amount of said default shall be fully paid up and satisfied, with costs of sequestration, after which said treasurer shall release the further revenues of said company to its proper officers."

The proposition of complainants is that these sections are in the nature of a statutory lien on the property of the railroad companies which received the bonds, for the security of the payment of these bonds, and that this lien inures to the benefit of any bondholder into whose hands they may come. This proposition naturally divides itself into two, namely: (1) Does the statute create a lien in favor of the state? (2) If it does, is it a lien which follows the bonds of the state into the hands of subsequent holders after they had been delivered to the companies?

I confess that but for the use of the word "lien," I see nothing in the power here conferred upon the legislature in the nature of a lien. The power is "to impose a *tax* upon the railroad company" sufficient, at first, to pay the interest accruing annually upon the bonds received from the state, and, after five years from the road's completion, an additional annual tax of two and a half per cent on the amount of the bonds, to be paid to the state. This tax is not made a lien on the property of the railroad companies by any express language. It is well settled that taxes are not liens unless they are expressly made so by the law or ordinance which imposes them. *Heine* v. *Levee Com'rs,* 19 Wall. 659; 2 Dill. Mun. Corp. 655.

The remedy given by the eighth section to enforce the collection of this tax repels the idea that the tax is a lien on the road, its franchises, or any other tangible property of the company, for it is limited to the sequestration of the *income and revenues* of the company until the amount of the default shall be paid. If there be any lien at all, it is confined to the income and revenues of the company, and does not extend to its road-bed, track, locomotives, or any other visible property. This is made still plainer by the guarded language, which, even for the purpose of securing or appropriating this income and revenue to the payment of the debt or its interest, does not authorize taking possession of the road or its rolling stock, nor the

operation of the road to produce income, but simply that the treasurer of the state may, by a writ of sequestration, "seize and take possession of the *income and revenues* of the company," until the amount in arrears is paid.    There is here no declaration of a lien on any property of the company, nor any authority to seize it or to sell it, or to proceed against it in any way to enforce the payment of the debt.    The remedy given implies that there is to be no other.    If, then, there is a lien, it covers only the income or other revenue of the company, if any such there be.

If the word "lien" were not in the statute, I think no one would infer a lien on anything from the nature of the transaction as it is described in the act.    Without the use of that word it is simply an authority to the legislature of the state to provide for the payment by these companies to the state of the money which it will have to pay on its bonds issued for their benefit.    This is to be done by what the statute calls a *tax* on the company, but it is no more a tax, in its essential character, though called so, than it is a lien, though that word is used.    The matter is simply a power in the legislature to assess or determine, from time to time, the sum which each company is reqired to pay to save the state harmless in regard to the bonds it has received, and a direction to the treasurer to collect this assessment by sequestrating the income of the company to the extent which may produce this amount.    The tax is not even to be assessed or levied on the property of the company.    It has no relation, in its amount, to the value of the company's property, but solely to the amount of its obligation to the state.    It would be difficult to find any definition of the word "lien" adapted to this transaction.    The manner in which the word "lien" is introduced into the statute, shows that it was not used in any clear or accurate sense, for it is a simple declaration that when the amount of the bonds issued to any company shall be paid to the state, either in money or in any of the state's bonds, the taxation shall cease, and "the said road shall be entitled to a discharge from all claims or liens on the part of the state."    These words were used, undoubtedly, out of abundant caution, and there could have been no thought in the minds of the legislature that by the use of this word in connection with the word "claim" they were *establishing* a lien not already created by the statute.    But it is not a lien, because the right conferred, whatever its nature, could only be exercised by some act of the legislature imposing the tax.    If the legislature failed or neglected to ascertain the sum which each company should pay, and fix the time at which it should be payable, there was no obligation, no fixed right, to enforce, and therefore no lien.    But the year after the passing of the act of 1868, to-wit, April 10, 1869, the legislature passed a statute to levy and enforce the collection of this tax.    By its first section the auditor of public accounts was required, on or before the first day of June and December, to certify to the treasurer the amount which the state will have to pay for interest

on the bonds issued to each railroad company, and the treasurer was to notify the companies. If the companies, or any of them, neglected to pay, the Pulaski chancery court was to issue the writ of sequestration provided for in the act of 1868, and appoint a receiver to execute it. This he was to do by taking possession of all the incomes and revenues of the defaulting company, with authority to demand and receive all moneys coming to the same from the operation of said road, and it is made the duty of all the officers of said company to return all moneys to him. It also provides that only the net proceeds or surplus, after the necessary costs of operating said road, shall be applied in discharge of the tax due and unpaid.

That this was the true construction of the act of 1868 is made clear by a comparison with the previous legislation of the state on the same subject; for this was not the first statute passed to aid by a loan of its credits in building roads within its border. A statute of the previous year, approved March 18, 1867, had authorized the issue of bonds to the extent of $10,000 per mile to any company which had prepared 40 miles of its road-bed to receive the rails, and the bonds were only to be issued in that proportion as fast as the track was so prepared. The fifth section of that act in the strongest terms declared that these bonds should constitute a lien—a *mortgage lien*—on all the property, rights, and credits of the company receiving them, paramount to all other debts, contracts, and liabilities of said road. This purpose is thus expressed:

"Sec. 5. Be it further enacted, that the receipt of any railroad company, for the bonds loaned to it by the state, shall immediately operate as a lien on the road, its rights, franchises, and all its property of every description, real and personal; and this lien shall be a mortgage on all the property, rights, and credits of the road, and shall have priority over any and all other debts, contracts, and liabilities of said road; and said mortgage shall continue until the entire amount loaned to the said road by the state shall have been paid off."

Subsequent sections of the act make provision for the enforcement of this lien by seizure, by the governor, of the road and other property of the company, by appropriating the income to the payment of the interest, and to the creation of a sinking fund to pay the principal, and finally, if necessary, by an absolute sale of all the property thus pledged to secure the state. The existence of these stringent provisions in the act of 1867, which are all left out of the act of 1868, which latter act expressly repeals the former, and the contained limitation of the remedy to an appropriation of the net income of the company, can leave no doubt that the other property of the company was not to be subjected to any lien for the payment of the bonds issued by the new law. Under this law of 1869, which is the practical interpretation of the legislature of its power under the act of 1868, only the surplus income or net profits arising from the operation of the road could be subjected to the payment of such tax as the legislature might impose for its payment. The state, therefore,

if it had paid punctually the interest on the bonds, according to the promise which they bear on their face, and according to the pledge of its faith contained in the act of 1868, could only assert a right to receive such surplus revenue or net income as might arise from the operations of the road of the company in default, after paying the necessary operating expenses of the road. There is in the bill of complaint in these cases no allegation that there is any such surplus income, or any other revenue of the companies, or of either of them, which can be seized under the writ of sequestration, if one were issued by the treasurer or by the chancery court of Pulaski county, under the act of April 10, 1869. But this act of 1869 was repealed in express terms by the legislature by act of May 29, 1874, and the special proceeding pointed out for the state by act of 1869 no longer exists as a remedy. Supposing, however, that this appeal left the state to such remedy as can be found in the original act of 1868, and that this court can be called on to administer the equity of that act, it remains true that until it is shown that there is some revenue of the defaulting company to which the court can resort, or some net income of the company beyond the current expenses of operating the road, which the court could appropriate to the satisfaction of complainants' claims, the court would be without power in the premises. There was no power in the state to seize the road or to operate it, or to take any of the tangible property of the company for that purpose. There can, therefore, be none in the court, for the court can only enforce such right as the statute gave the state. It is further to be observed that the whole theory of the bill in this case, and of the remedy sought by it at the hands of the court, is founded on the idea that there is a lien in favor of the holders of these bonds prior to all other liens, on the road itself and its running stock, which may be subjected to sale for the satisfaction of the debt of the plaintiffs against the state of Arkansas.

I have thus far discussed the questions at issue as though the holders of these bonds are entitled to be subrogated to all the equities, whether they amount to a lien or not, which the state of Arkansas might have had against the companies which originally received these bonds.

It remains to be considered how far the security which the statute gave the state of Arkansas against loss on account of the bonds she might issue to the companies can be made available in a court of equity against the present owners of the roads to aid in building which the bonds were issued, in favor of the present holders of these bonds. Three adjudged cases are cited by counsel, and much insisted on in the argument, as precisely covering this case. The first of these which I shall notice is the case of *Hand* v. *S. & C. R. Co.* 12 S. C. 314. In that case the lien given by the statute was in express terms to secure the payment of the *bonds.* The act provided for bonds of the railroad companies, which were to be indorsed by the state and

delivered to the company. The statute of South Carolina is as follows:

"That as soon as any such bonds shall have been indorsed, as aforesaid, for the first section of the road, as aforesaid, they shall constitute a lien upon such section, so prepared, as aforesaid, including the road-bed, right of way, grading, bridges, and masonry," etc., "and upon said iron rails, spikes, and equipments, when purchased, and the state of South Carolina, upon the indorsing of the said bonds, and by virtue of the same, shall be invested with said lien or mortgage, without a deed from the company, for the payment by said company of said bonds, with the interest thereon as the same becomes due."

It was contended by the railroad company, in the suit before the state court by bondholders to enforce this lien, that it inured to the benefit of no one but the state, and did not follow the bonds so indorsed into the hands of subsequent holders.

To this the court made the following reply:

"We are required to say that the vesting of the lien in the state *means* that the state shall have it exclusively, *notwithstanding other portions of the same section of the act indicate an intent that it shall inure to the benefit of the bondholder.* That portion of the section which vests the lien in the state sets forth the objects for which the lien was created and vested, namely, a security for the payment of the bonds and interest."

If the statute in the present case had made as clear a declaration of a lien on the property of the company, and that the *bonds* themselves constituted the lien, there would be no difficulty in holding— at least there would be none to me—that the existence of this lien was co-extensive with the existence of the bonds, in whose hands soever they might be found, until they and the lien were both extinguished by payment or some other form of satisfaction.

So in the case of *Railroad Cos.* v. *Schutte,* 103 U. S. 118. In that case the state of Florida had, by a statute, provided for the issue and delivery by the state of her bonds to certain railroad companies. The statute required before this should be done that the railroad companies should deliver to the state its own bonds of corresponding character, principal and interest payable at the same time the state bonds were. The statute also declared that these company bonds should be a first-mortgage lien on all the property of the company which issued them, and should be held by the state as security for the payment by the company of the bonds of the state. Not only did the statute make this provision, but on the face of every bond of the state issued under this law, there was the following indorsement:

"This bond is one of a series issued in aid of the" (railroad company, naming it) " to the extent of $16,000 per mile upon completed road; the state of Florida holding the first-mortgage bonds of said railroad company for a like amount, *as further secured to the holder thereof.*

"HARRISON REED, Governor of Florida."

The supreme court, in holding the companies liable to the holders of the state bonds, speaking of the transaction, says:

"It is clear, therefore, the intention was that, as between the state and the company, the state was to be the guarantor of the company's bond and the

principal debtor. With the public, however, it was different. There the state was the debtor, and the company was only known through the statutes under which the bonds were put out, and the certificates indorsed on the bonds themselves, which were that the state held 'the first-mortgage bonds of the railroad company for a like amount as security to the holder thereof.' Such bonds of the state, with such indorsements, the company put on the market and sold. Under these circumstances the certificate of the governor, as to the security held by the state, is, in legal effect, the certificate of the company itself, and equivalent to an engagement on the part of the company that the bond, so far as the security is concerned, is the valid obligation of the state. The case is clearly within the reason of the rule which makes every indorser of commercial paper the guarantor of the genuineness and validity of the instrument he indorses."

Again the court says:

" In our opinion there is no occasion for applying here the doctrines of subrogation, because in unmistakable language the statute has made the mortgage of the company security for the payment of the obligations of the state."

No such language can be applied to the act of 1868 of the Arkansas legislature. No indorsement whatever is made on the bonds of the state; no reference to any security held by the state is found in the bonds on which this suit is brought, nor in the negotiation of their sale.

The state, as is said in the case of *Railroad Cos.* v. *Schutte,* is the primary debtor, and to the state alone must the holders of her bonds look for payment, unless the statute gave a lien on the property of the railroad company, which follows the bond into the hands of every purchaser. The circumstances which gave the holder this right in the South Carolina case and in the Florida case, and which, in the opinion of the courts in those cases, were relied on as for that proposition, do not exist in the case before us.

The case of *Ketchum* v. *St. Louis,* 101 U. S. 306, is a complicated one, differing in many respects from this case. The county of St. Louis, under authority of an act of the legislature of Missouri, issued to the Pacific Railroad of Missouri her bonds for $700,000, and the railroad company agreed to pay out of its earnings $4,000 per month to the county until the principal and interest of the county bonds were paid. The city of St. Louis, which, by an act of the legislature, had superseded the county as a municipal corporation, brought this suit to enforce that agreement.

It will be observed here that it is not the holders of the bonds of the county who bring the suit, but the city itself, the original party to the transaction, and to whom it is asserted the lien was given. The case, therefore, does not bear on the question of a transfer of the lien or security to the purchasers of the bonds.

The court below, and the supreme court, decide that the act of the Missouri legislature, under which the county issued her bonds to the company, *and the agreements made at the time, gave to the county* a right paramount to every existing debt or obligation of the company to

these earnings. The state could make such a valid declaration, for it was at the time holder of the only prior mortgage of the company, and thus waived this priority. Under the law as it then stood there was a fund commissioner, whose duty it was, when the company was in default, to receive these earnings, and dispose of them as they were directed.

The new statute declares that this officer, "*or such person as may at any time hereafter have the custody of the funds of said railroad company,* shall, every month after said bonds are issued, pay into the county treasury of St. Louis county, out of the earnings of said Pacific Railroad," $4,000 per month, and $1,000 additional in each month of December, to meet the interest on said bonds until said bonds are paid off by the Pacific Railroad.

The supreme court declared that this contract could be specifically enforced against a receiver of the road operating it under an order of the court, and against a purchaser under a foreclosure of the state's mortgage.

If the case before us were a bill on the part of the state which was paying the bonds it had issued to the company, a specific contract of the company to pay a specific sum out of its net earnings per month, there might be some analogy; but the cases are in many respects so different, that, though there may be some analogy, I do not think the one governs the other. None of these cases, therefore, support that of complainants here. Nor does the doctrine apply that a creditor has the right to claim the benefit of a security given by his debtor to his surety for the latter's indemnity, for the state here is the principal debtor, and not the surety, as held by the supreme court in *Railroad Cos.* v. *Schutte, supra,* and in *Chamberlain* v. *St. Paul, etc., R. Co.* 92 U. S. 299. In this latter case the true doctrine governing the present case is laid down. An act of congress having donated lands to aid railroad companies in Minnesota in constructing their roads, the state also issued to one of these companies her bonds under a statute somewhat analogous to the Arkansas statute. In the Minnesota case, however, these government lands and the net profits of the road were pledged to the state as a security against loss, both by the statute and by a mortgage and bonds. All this was done, and Chamberlain, the plaintiff, received $100,000 of these bonds of the state for work in construction of the road. The railroad company became insolvent; the state purchased the road and the lands under her mortgage, but never paid her own bonds. The suit was an attempt by Chamberlain, in a chancery court, to enforce the lien of the state for his own benefit. The supreme court said:

"The general doctrine that a creditor has a right to claim the benefit of a security given by his debtor to his surety for the latter's indemnity, and which may be used, if necessary, for the payment of the debt, is not questioned. The security in such cases is in the nature of trust property, and the right of the creditor arises from the natural justice of allowing him to have applied to the discharge of his demand the property deposited with the surety

for that purpose, if required by the default of the principal. In this case the deed and mortgage to the state were not intended to create a trust in favor of the holder of the bonds. The state was primarily liable to the bondholders, and it was only as between her and the company that the relation of principal and surety existed." 92 U. S. 306.

That the right of the state to levy a tax on the railroad companies was, in the language just quoted, "not intended to create a trust in favor of the bondholders," is manifest from the provision that the companies could discharge themselves from all liabilities by payment of the amount of the state bonds into the state treasury at any time it suited their convenience, without regard to the time when the bonds fell due, or to the rate of interest they bore. It is important to observe, also, that this could be done by making payment in any of the railroad bonds of the state, so that one of these defaulting companies, by buying at a discount bonds of the state issued to other companies, could discharge themselves of the lien which it is now asserted exists as security for the bonds which they had received and issued, without redeeming a single one of their bonds, or paying a dollar in satisfaction of their principal or interest. These bondholders, in such an event, would be left just where they are now, with their sole reliance on the faith and credit of the state, which, in my opinion, is all they ever had or bargained for when they took the bonds, and which is all the statute or the nature of the transaction was intended to give them.

I have thus far said nothing about the *status* of the defendants as innocent purchasers of the property of the original company, which is the position asserted for one of them, and of the fact that under subsequent mortgages there are bondholders whose right to the property of the company and to an appropriation of their income is superior to that of complainants. But if I do not go into this question, it is not because it is unworthy of consideration, but because I am of opinion that no lien in favor of the holders of the state bonds was created by the acts of the Arkansas legislature, and if such a lien can possibly be inferred in favor of the state, it does not pass to the creditors of the state, either by anything found in the statute itself, or by any recognized principle of law.

I am of the opinion, therefore, that the bills in these cases should be dismissed.